UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Samuel Thomas Lanier,<br><br>　　　　　　Defendant. | No. 2:19-cr-00084-KJM<br><br>ORDER |

      The United States and defendant Samuel Lanier dispute the amount of restitution he must pay to the Federal Emergency Management Agency (FEMA) under the Mandatory Victim Restitution Act. The United States has carried its burden to demonstrate **the amount of restitution due is $1,223,552**, as explained in this order.

      In 2019, the government filed a criminal information charging Lanier with seven counts of fraud against the United States under 18 U.S.C. § 1031. ECF No. 1. It alleged he had submitted fraudulent requests for federal funds under the Staffing for Adequate Fire and Emergency Response (SAFER) grant program, which FEMA administers. *See id.* ¶¶ 12–13. Lanier agreed to waive an indictment and plead guilty. *See* Waiver, ECF No. 7; Plea Agreement, ECF No. 8. In his plea agreement, Lanier admitted to a detailed description of what he had done. *See* Plea Agreement at 2 & Ex. A (factual basis). His two companies, FireWhat, Inc. and Cedar Flats Development Company LLC, administered SAFER grants for two fire chiefs associations in

1

1   Siskiyou and Shasta counties. *Id.* at A-1 to A-2.  The grants were intended to help recruit and
2   retain volunteer firefighters. *Id.*  Lanier was primarily responsible for distributing grant funds and
3   requesting funds from FEMA, and he had often requested reimbursements for goods or services
4   that the associations had never actually received. *Id.* at A-2.  Lanier's businesses diverted the
5   federal grant money to other purposes. *Id.*  The court sentenced Lanier to a prison term of twelve
6   months and one day for each of the seven counts in the indictment, with these sentences to be
7   served concurrently. *See* Judgment & Commitment at 2, ECF No. 69.  After completing the
8   prison term, Lanier will serve a two-year term of supervised release. *Id.* at 3.

    In addition to this sentence, Lanier must pay restitution to FEMA under the Mandatory
10  Victim Restitution Act. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  In his Plea Agreement,
11  Lanier agreed a restitution payment is mandatory, and he agreed "to pay the full amount of
12  restitution to all victims affected by [his] offense," including FEMA, "for the period[] of 2013
13  through 2018," but he did not agree to a specific restitution payment.  Plea Agreement at 3.  The
14  court deferred its decision about the appropriate amount of restitution to allow the parties to
15  present evidence and arguments. *See* Judgment & Commitment at 6; Stip. & Order, ECF No. 75.
16  The court received full briefing and held an evidentiary hearing on February 24, 2023. *See* Gov't
17  Br., ECF No. 82, *as revised*, ECF No. 90; Def. Br., ECF No. 87; Opp'n, ECF No. 91; Hr'g Mins.,
18  ECF No. 95.  Veronica M.A. Alegria appeared for the United States, and Noa Oren appeared for
19  Lanier.  The government presented testimony from David Gudinas, a FEMA administrator, who
20  testified about the SAFER grants program and how FEMA administers that program.  The
21  government also presented testimony from Lloyd Day, a forensic accountant, who gave an
22  opinion about what amount would make FEMA whole.  Lanier did not present witness testimony.
23  The parties then made closing arguments orally, and the court took the matter under submission.

    The relevant law is simple and undisputed.  The amount of restitution is "the full amount
25  of each victim's losses." 18 U.S.C. § 3664(f)(1)(A).  The restitution amount should "fully
26  compensate victims for their losses, and . . . restore victims to their original state prior to the
27  criminal act." *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016).  The government bears
28  the burden of demonstrating the amount of the loss by a preponderance of evidence.  18 U.S.C.

1  § 3664(e). In resolving disputes about the proper amount of restitution, the court must "set forth
2  an explanation of its reasoning, supported by the record." *United States v. Waknine*, 543 F.3d
3  546, 556 (9th Cir. 2008).

4  As summarized above, Lanier requested and obtained payment for some expenses that no
5  one ever actually incurred. The value of FEMA's loss is the total paid for all of these fictional or
6  overstated expenses. One way to calculate that value is by finding the difference between all
7  legitimate grant expenses and the payments Lanier received from FEMA. The government and
8  Lanier agree in general that this calculation will yield an appropriate estimate of the amount of
9  restitution due. They disagree about the specifics.

10  The government relies on calculations by its forensic accountant, Lloyd Day. Day created
11  separate estimates for FireWhat and Cedar Flats. For FireWhat, he relied on accounting
12  information recorded in an electronic bookkeeping file generated by QuickBooks, an accounting
13  application. Ex. 1 at 2. Day concluded that FireWhat had actually and regularly used
14  QuickBooks, and he believed the QuickBooks records were accurate. *Id.* at 3. The general ledger
15  included more than 37,000 transactions for the relevant period, which amounted to more than 600
16  transactions per month on average. *Id.* FireWhat's chief operating officer and bookkeepers, who
17  were not implicated in the fraud, also told the government the QuickBooks entries were accurate.
18  *See* Ex. 4 at 2 (Russell Merrit Interview Summary); Ex. 26 at 1 (Ann Cook Interview Summary);
19  Ex. 37 at 1–2 (Blake Michaelson Interview Summary).

20  Day used QuickBooks to create a profit and loss report, which showed how much
21  FireWhat had spent and for what. Ex. 1 at 3. He found it had recorded grant expenses in several
22  accounts. *Id.* He also looked in other accounts, including payroll expenses. *See id.* at 3–4. In
23  this way, he captured both the "direct" expenses, such as the costs of physicals, and the "indirect"
24  expenses, such as wages. *See id.* at 3–5. In total, he found about 2,000 transactions, totaling
25  $760,257.92 in grant expenses. *Id.* at 15. Day then calculated the total value of all SAFER grant
26  funds paid to FireWhat. He used the profit and loss report and images of checks paid to
27  FireWhat. *See id.* at 2, 4, 15; *see also* Ex. 6 (check images). Day concluded a total of $1,932,413
28  had been paid to FireWhat. *See* Rev'd Rest. Req., ECF No. 90; Ex. 30 at 6. Then, subtracting

3

total grant expenses from total amounts paid, he estimated FireWhat had overstated its true expenses by $1,172,155. Ex. 30 at 6.

Day testified during the evidentiary hearing he could not use the same method to estimate how much Cedar Flats had overstated its true grant expenses. He could not verify the QuickBooks information he received for Cedar Flats was accurate. Instead, he relied on Cedar Flats' bank records, check images and information received from Lanier. *See* Ex. 18. He found evidence to show Cedar Flats had received $228,647 in SAFER grant funds and had spent $177,251 on legitimate grant expenses. *See generally id.*; *see also* Ex. 30 at 36–41 (summarizing findings). The difference between these amounts, $51,396, is Day's estimate of Cedar Flats' overstated expenses. Ex. 30 at 43.

Finally, by adding the FireWhat estimate and the Cedar Flats estimate, Day reached the conclusion that Lanier's companies had wrongfully diverted $1,223,552 in SAFER grants to other purposes. *See* Ex. 30 at 76. That sum is the government's estimate of FEMA's loss and its proposed restitution payment.

Lanier does not dispute the amount of restitution should be estimated by subtracting the value of true grant expenses from the value of SAFER grants received, but he proposes a smaller restitution amount. He cites three specific overstated expenses: (1) he billed $551,200 for accidental death and disability insurance but paid $215,477; (2) he billed $132,000 for a leadership summit but spent $81,000; and (3) he invoiced FEMA $60,704 for physical exams, but spent $39,824. *See* Opp'n at 2. Lanier proposes a restitution payment equal to the sum of the three overstated amounts, i.e., $407,603. *See id.* at 1–2. This proposal adopts something of an affirmative strategy; it begins by identifying specific overstated expenses. In this way, Lanier's method contrasts with the government's method, which begins with all SAFER grant payments and then excludes any expenses that can be attributed to legitimate grant expenditures.

The court declines to adopt Lanier's proposal, which relies on the implicit and unsupported assumption that every expense other than the three listed expenses was legitimate and accurately invoiced. It is also unclear how that assumption can be reconciled with the admissions Lanier made in adopting the factual basis of his plea agreement. For example, he

agreed he invoiced FEMA for $18,500 in EMT training for the Shasta association, but he admitted that training never occurred. Plea Agreement at A-3. He also agreed he invoiced FEMA $204,000 for training on behalf of the Siskiyou fire chiefs association but spent only $60,442.21. *Id.* at A-2. Despite these admissions, Lanier does not list firefighter and EMT training among the types of overbilled expenses in his restitution proposal.

In addition to his affirmative restitution proposal, Lanier critiques the government's proposal. He relies on four arguments. None is persuasive.

First, Lanier argues the government was wrong to rely on FireWhat's QuickBooks records because FireWhat's staff used QuickBooks incorrectly and inconsistently. *See* Opp'n at 3. He cites a May 2022 report by Annette Stalker, which was attached to his objections to the Presentence Report. *See id.* (citing Stalker Report, ECF No. 58-1). Stalker did not testify at the restitution hearing, however, and her May 2022 report was not admitted into evidence during the restitution hearing. A presentation prepared by Ms. Stalker summarizing her opinions was admitted, however. *See* Hr'g Mins., ECF No. 95 (recording admission of Government Exhibit 28). The court will consider Stalker's presentation, but not her previous report.

According to that presentation, Stalker is a Certified Public Accountant with certifications in financial forensics and fraud examination (CFF and CFE). *See* Ex. 28 at 1. In her opinion, Lloyd Day was wrong to rely on class codes, which are optional descriptors a QuickBooks user can use to identify similar entries. *See id.* at 11–13. Stalker found FireWhat had not used these descriptors consistently throughout the fraud. *See id.* at 14–15. Some entries had no class codes at all. *See id.* at 13, 15. Because Day had identified grant expenses using class codes, he might have wrongly excluded entries for legitimate grant expenditures. *See id.* at 13–15. If Day wrongly excluded legitimate expenses from his calculation, then his estimate of FEMA's loss would be too large, because he subtracted legitimate grant expenses from the total value of SAFER grant funds received when he estimated FEMA's losses.

The parties' disagreement in this respect boils down to a difference in expert opinion about what evidence is the best indicator that a line item is or is not associated with a particular purpose. Lloyd Day required contemporaneous and reliable documentation before he was willing

5

to conclude a particular entry was legitimate and related to a grant expense. He believed the QuickBooks codes were the best available evidence for that purpose: they were created at the time of the entry, the employees who made these entries were not involved in the fraud, and witnesses told government investigators they believed the QuickBooks records were accurate. At the restitution hearing, Day also testified persuasively and without contradiction that other methods, such as deciphering short descriptions within FireWatch's bank records, would yield less reliable results. Day cited Stalker's own example to illustrate his opinion. Stalker had identified a bank record suggesting a payment to "Pusher, Inc." had been wrongly excluded as a result of a missing class code. *See* Ex. 28 at 15. Based on interviews with FireWhat's CTO, however, Day knew that only some of Pusher's work was related to the SAFER grants. Ex. 30 at 52. He decided to rely on the QuickBooks codes, which identified the Pusher expenses that were related to grants. *See* Ex. 30 at 52–53. Day's decision to rely on the QuickBooks codes was a sensible response to the problem he faced.

Second, Lanier argues Day erred by relying on the QuickBooks file because the file might have been corrupted. Opp'n at 3. As Day recognized in his report, 400 of the 900 payroll tax entries in FireWhat's QuickBooks file were blank. *See* Ex. 1 at 5. Day noted the missing entries but did not suspect or suggest the file was corrupted. Lanier does not explain why blank entries in one accounting category demonstrate the entire file was corrupted.

Third, Lanier argues Day wrongly refused to credit him for the value of his and others' labor. *See* Opp'n at 3–4. He argues the government should recognize the value of the services he and FireWhat provided to the two county fire chiefs associations. *See id.*; *see also* Def.'s Br. at 3–4. Day estimated FireWhat spent about $150,000 in labor and related costs for the time employees devoted to grant work. *See* Ex. 30 at 24–25. He relied here as well on the QuickBooks records. *See id.* He found these records were reliable, as they had been created at the time by FireWhat's accounting staff. The alternatives to these records—such as Lanier's own subjective, post-pleading assessments of the value of his and others' time—are less reliable and subject to manipulation. *See* Gov't Br. at 10; Ex. 30 at 60.

In addition, as the government persuasively argues, Lanier perpetrated a fraud, so crediting him for his time might compensate him for executing and hiding that fraud. That fact distinguishes this case from *United States v. Bhika*, which Lanier cites. *See* Def.'s Br. at 3–4 (citing No. 19-0115, 2021 WL 3854753, at *3 (N.D. Cal. Aug. 30, 2021)). In *Bhika*, the trial court credited a kickback recipient for the services he had provided because he had in fact provided those services: "he did something for his employer in exchange for the money that he wrongfully obtained." 2021 WL 3854753, at *3. Lanier, by contrast, has admitted he billed the government for benefits it did not receive.

Finally, Lanier argues the government's position wrongly incorporates the FEMA grants into FireWhat's contracts with the two county associations by reference. *See* Opp'n at 4. The government did not advance such an argument at the restitution hearing. Instead, it contended that relying on negotiated administrative costs and estimates of the value of employee labor might have double-counted or otherwise overestimated FireWhat's expenses. This was one reason Day elected to rely on the QuickBooks file when he could. *See* Ex. 30 at 53–69; Gov't Br. at 12.

Considering the entirety of the record in light of the applicable law, the government has met its burden of demonstrating the amount of the loss by a preponderance of evidence. *See* 18 U.S.C. § 3664(e). For that reason, **the government's request for restitution of $1,223,552 is granted.**

IT IS SO ORDERED.

DATED: April 12, 2023.

CHIEF UNITED STATES DISTRICT JUDGE